IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 18-cv-02919-KLM

JEANETTE RODRIGUEZ,

     Plaintiff,

v.

ARAPAHOE COUNTY SHERIFF TYLER S. BROWN, in his official capacity,

     Defendant.

_____

## ORDER ON SUMMARY JUDGMENT
_____

**ENTERED BY MAGISTRATE JUDGE KRISTEN L. MIX**

     This matter is before the Court on **Defendant's Motion for Summary Judgment** [#41][1] (the "Motion"), which seeks judgment as a matter of law on Plaintiff's employment claims. Plaintiff asserts discrimination and harassment on the basis of sex, race, and national origin in violation of Title VII and the Colorado Anti-Discrimination Act ("CADA"), Colo. Rev. Stat. § 24-34-401 *et seq.* (Counts I and III), and retaliation in violation of Title VII and CADA (Counts II and IV). *See Second Am. Compl.* [#37] ("Complaint"). The Court has reviewed the Motion [#41] and Exhibits [#41, #43, #44,#45, #47, #49, #52], the Response [#48], the Reply [#50], the case file, and the applicable law, and is sufficiently advised in the premises. For the reasons set forth below, the Motion [#41] is **GRANTED** as to all claims.

---

[1]  "[#41]" is an example of the convention the Court uses to identify the docket number assigned to a specific paper by the Court's case management and electronic case filing system (CM/ECF). This convention is used throughout this Order.

## I.  Material Facts

Unless otherwise noted, the facts set forth below are deemed to be undisputed.  The Court has generally cited to the evidence in support of a fact only when the fact is disputed. Facts not specifically disputed are deemed to be admitted, and the Court has not considered Plaintiff's arguments or unsupported facts in her Response to Defendant's Statement of Material Facts or her Statement of Additional Disputed Facts.  *See*, *e.g.*, *Response* [#49], Plaintiff's Statement of Additional Disputed Facts ¶ 27 - "Plaintiff worked in an environment saturated with unlawful discriminatory animus . . . . Plaintiff has experienced a textbook case of discrimination. . . .")  Finally, while the Court has considered all of the well-pled facts, it has not discussed every fact, and some of the disputed material facts are discussed in connection with the analysis in Section III.

Turning to the facts, Plaintiff has been employed by the Arapahoe County Sheriff's Office ("ACSO") as a non-certified deputy since 2008.

On February 10, 2015, a heated argument occurred between Plaintiff and Instructor Quinn Cunningham ("Cunningham") during an in-service firearms training regarding her performance in a scenario where she shot at a particular target.  Plaintiff was removed from the range by instructor Deputy Chuck Johnston.  This occurred after Plaintiff attempted to holster while lying prone, and thereby pointed the muzzle of her weapon in the direction of one or more persons at the range.  Pl.'s Dep. [#41-1] at 115:14-116:6, 133:4-138:10; Cunningham Decl. [#41-2] ¶ 5(a)-(b); Cunningham Mem. [#41-3] at 2; Johnston Decl. [#41-6] ¶¶ 4-8.  Plaintiff was removed from the range.  Plaintiff denies Defendant's assertion that she instigated the disagreement, instead asserting that it was the other way around.  Pl.'s Dep. [#41-1] at 135:3 (testifying that Cunningham "started yelling and screaming"); see also

101:12-102:4 (testifying that Cunningham stated, "You're a fucking liar.  You're fucking kidding me.  You aren't even there.  You're not a good shot.")

As a result of the in-service training, it is undisputed that Plaintiff was restricted from carrying a firearm and ordered to attend remedial firearms training.  She attended this training on February 13, 2015 with instruction from Investigator Stevie True ("True") and Deputy Joe Van Hook ("Van Hook"), who were both lead firearms instructors for the Arapahoe County Sheriff's Office ("ACSO").  Plaintiff does not dispute this but asserts that the very fact she was ordered to attend remedial training was a discriminatory act and comprised an adverse act not experienced by similarly situated individuals.  *Response* [#49] at 2-3.  This is, however, improper argument.

Although Plaintiff did not repeat the holstering violation during remediation, Deputies True and Van Hook noted additional concerns at the training on February 13, 2015, in particular, questionable decision-making during scenario-based simulator training.  Plaintiff admits this, but argues that the deputies' credibility is suspect because she passed the remedial firearms training.  *See* True Mem. [#49-5] at 2; Chase Dep. [#49-4] at 122:25-123:10 ("Deputy Rodriguez passed the POST certified hand gun qualification").

Also in support of Plaintiff's assertion that she passed the training on February 13, 2015, Plaintiff relies on a TrakStar entry [#49-3] authored by Plaintiff's supervisor.  That entry states "[Plaintiff] was prohibited from any other participation that day, restricted from carrying her firearm in her official capacity as a Deputy Sheriff until further notice, and scheduled for remedial training on 02-13-15, which she **successfully completed**.") (emphasis added).  *Id.*  Defendant points out, however, that the person who wrote the entry stated in unrebutted testimony that when she wrote the document, she intended to

convey only that Plaintiff had successfully qualified, not that she had successfully remediated all of the issues that resulted in the training.  Wickstrom Decl. [#45-2] ¶¶ 5-6. Additionally, Defendant states that passing a qualification test is not the same as demonstrating the ability to safely handle a handgun during remediation.  Dickson Dep. [#49-11] at 43:17-45:5.  The TrakStar entry is discussed in more detail in Section III, *infra*.

On March 19, 2015, Plaintiff learned that she would be scheduled to attend more remedial training to address her decision-making skills in situations involving firearms use, which she attended on May 7-8, 2015.

On June 12, 2015, Captain Jared Rowlison initiated an Internal Affairs ("IA") complaint about whether Plaintiff's inability to remediate the safety and decision-making concerns with her firearm use amounted to a policy violation requiring disciplinary action.

 Per ACSO Policy ADM 306, Plaintiff was interviewed on June 17, 2015 by Deputy Inspector (Sgt.) Shane Walker and, at the end of the investigation, was permitted to review the file before meeting in a face-to-face review with Lieutenant Adam Burson ("Burson") to provide any additional information.  After their meeting, Burson recommended that Plaintiff be removed as a deputy for inability to "perform the duties of the Deputy position," a decision concurred with by Bureau Chief Vincent Line.

On August 19, 2015, Plaintiff met with HR Manager Jon Takayama to discuss her options for continuing as an ACSO employee in a non-commissioned position, at which time she was notified of her right to appeal the IA recommendation.

On August 26, 2015, Plaintiff appealed the IA recommendation and met with Sheriff Walcher on September 1, 2015.  At that meeting, Plaintiff accused Cunningham and True of discriminating against her because she is Hispanic and female.  Sheriff Walcher referred

the matter to IA Inspector Travis Stewart ("Stewart"), who interviewed Plaintiff on September 3, 2015.   According to Defendant, Plaintiff stated she believed Cunningham and True discriminated against her because she is Hispanic, but that neither Cunningham nor True ever made negative comments about her race.   Plaintiff admits this, but refers to various complaints that she made that Cunningham and True discriminated against her. *See* Pl.'s Dep. [#49-1] at 291:5-7, 294:16-18.

Stewart subsequently closed the investigation without finding any policy violations or sufficient evidence to support the allegations, and referred the matter back to Sheriff Walcher.   Sheriff Walcher informed Plaintiff on October 8, 2015 that he would decline to terminate her as a deputy provided that she attend additional remedial training to address her documented firearms, safety, and decision-making deficiencies.

On November 19, 2015, Plaintiff was placed on a 90-day work plan (PIP) for additional remedial training including: (a) firearms training on Nov. 24, 2015 with True and Van Hook; (b) officer safety on Dec. 16, 2015; (c) defensive tactics on Dec. 22, 2015; and (d) attendance at the Mindset Bootcamp by the Westminster Police Department on January 27-28, 2016.   Plaintiff attended all of the scheduled training.

Plaintiff asserts that she was placed on the PIP plan despite being "cleared" by the IA investigation, but does not cite any evidence in support of that assertion.   Defendant disputes this, pointing to evidence that Plaintiff was not "cleared."   *See* IA Manual ADM 306 [#43-2] (showing no classification for "cleared"); IA Investigation Mem. [#43-5] at 8-9 ("Deputy Rodriguez has significant issues with her performance. . . .[I]t is obvious that she cannot perform the duties of the Deputy position.").   Further, Defendant asserts that the reason for sending Plaintiff for additional training was clearly explained by the IA findings

and by Sheriff Walcher.  IA Investigation Mem. [#43-5] at 8-9; Walcher Decl. [#44-4] ¶ 21.

At the end of the PIP, on March 3, 2016, Plaintiff was notified she had not performed satisfactorily during the training, was recommended for removal from her deputy position, and advised to assess for transfer to a non-deputy position.  Plaintiff was also placed on paid administrative leave.  Plaintiff again appealed this decision to Sheriff Walcher on March 10, 2016, and at a meeting on March 21, 2016, repeated her allegations of discrimination concerning True.

On June 13, 2016, Sheriff Walcher again declined to discharge Plaintiff but required her to complete a 40-hour firearms course at the Academy.  Plaintiff attended the 2016 Academy firearms training in five 8-hour sessions between August 1 and October 13, 2016.  All of these sessions were run by True and Van Hook, who handled general group instruction but left one-on-one instruction to six to seven other instructors.

Plaintiff filed an EEOC charge on January 3, 2017, which was officially communicated to the Sheriff's Office on January 5, 2017.

On January 4, 2017, Plaintiff met with Chief Line and Lieutenant J.D. Knight, and was informed for the third time that her safety and decision-making issues had not been successfully remediated, and that Chief Line would be recommending the Sheriff transfer Plaintiff to a non-commissioned position or, in the alternative, discharge her.

After Chief Line told Plaintiff of his recommendation, she responded that she had filed an EEOC charge, and then recounted her version of the events that had occurred over the previous two years.   Pl.'s Dep. [#41-1] at 176:8-20.  Chief Line told Plaintiff that he would "rescind the memorandum placing her on paid administrative leave and speak with the sheriff about her concerns."  Line Decl. [#43-6] ¶¶ 10-11.  Sheriff Walcher testified that

he "resolved not to accept the recommendation that her appointment be revoked, and instead, . . . asked that she undergo additional remedial training.  [Plaintiff] went back to work pending additional training."  Walcher Decl. [#44-4] ¶ 10.

In response to the allegations in the previous paragraph, Plaintiff denies only that Line "retracted" or rescinded his position and returned her to work.  Plaintiff asserts instead that Line placed her on administrative leave until he could talk to the sheriff.  Pl.'s Dep. [#49-1] at 176:13-24.  When asked how long she was on administrative leave, she responded: "I don't know. Every time they put me on admin leave, it's months."  *Id.* However, Plaintiff further testified that she was not on administrative leave for more than one hour.  *Id.* at 180:21-181:4; *see also* Line Mem. [#50-4].

On January 4, 2017, Sheriff Walcher ordered Patrol Services Bureau Chief Glenn Thompson to conduct a Sheriff's Inquiry (a thorough, independent investigation) into the matter.   Thompson reviewed numerous documents and interviewed fourteen (14) witnesses, including Plaintiff, and on May 1, 2017, issued a 48-page memo finding that there was no evidence to support Plaintiff's allegations of discrimination.[2]

On October 17, 2017, Plaintiff amended her EEOC charge to allege retaliation for having filed the original charge on January 3, 2017.  On August 20, 2018, the EEOC dismissed Plaintiff's charge and issued her a right to sue letter.

Plaintiff filed the instant lawsuit on November 13, 2018, one week after Tyler S. Brown was elected Sheriff of Arapahoe County.  Sheriff Brown and his new executive staff, including Undersheriff Mark Nicastle, were sworn in on January 8, 2019.

---

[2]  Plaintiff admits that this was the conclusion, but denies that the Inquiry was a "thorough, independent investigation."  Plaintiff cites no evidence, however, to support that assertion.

On March 27, 2019, Plaintiff met with Undersheriff Nicastle.  Undersheriff Nicastle informed Plaintiff that she was working under a weapons restriction Sheriff Brown was not comfortable with, and that Plaintiff would need to undergo additional training so the Sheriff could determine whether she was capable of remaining in the job without the restriction.

On May 1, 2019, Plaintiff was ordered to attend the training identified by Undersheriff Nicastle.  Plaintiff initially refused, was placed on paid administrative leave, and referred to IA for refusing to comply with the order.  The next day, however, Plaintiff relented and attended the mandatory training consisting of three 8-hour sessions pertaining to firearms proficiency, officer safety, and defensive tactics, which she successfully passed.

Plaintiff testified that "from my experience of working at the Sheriff's Office for 11 years, that certain people of certain races are treated differently. . . ."  Pl.'s Dep. [#49-1] at 32:4-7.  When asked whether Plaintiff contended that she was treated differently because she was female or Hispanic, or both, Plaintiff testified:

> All of them. I don't believe you can – you can separate all of them. It's – it's – my situation is very unique. I was an adult when I started learning English. I speak English as a second language, with an accent. I come from another country with a different culture. I came here – and I'm working at the Sheriff's Office and I – to begin with, being a female in a male-dominated world is different. It's hard. And we all – all us females there, we share that. On top of that, I'm Hispanic. And on top of that, there are many Hispanics there, but they don't speak English with an accent. I believe I'm the only one, Spanish-speaking female, Venezuelan that speaks with an accent, and think that makes my – my situation very unique. And it makes me a special target as well.

*Id.* at 34:20-35:9.

Plaintiff asserts that Sheriff Tyler Brown , the current Sheriff, testified that the reason Plaintiff was require to undergo firearms training again in 2019 was because: "[t]here were some things brought to my attention, and I believe that it was only fair due to the time gap

between the last trainings that I had a fair assessment of her skills and ability – to make a determination."  Brown Dep. [#49-12] at 47:19-22.  Yet, Plaintiff states that Sheriff Brown could hardly articulate why he was subjecting Plaintiff to this action.  He could not name any other deputies, out of "several hundred," that he was requiring additional firearms training, nor could he state the basis for his decision other than that Plaintiff's case was brought to his attention by the undersheriff.  *Id.* at 51:7-54:1.

Defendant denies the facts in the previous paragraph, but does not dispute Plaintiff's characterization of Sheriff Brown's testimony.  Instead, Defendant asserts that Undersheriff Mark Nicastle ("Nicastle") made the decision Plaintiff attempts to attribute to the Sheriff. Nicastle Decl. [#45-1] ¶¶ 4-5.  Nicastle testified that Plaintiff was asked to remediate because the only information available from which the administration could assess Plaintiff's abilities was information from 2016-2017 which demonstrated that Plaintiff was unable to comply with the minimal standards of safe handgun operation or demonstrate good judgment and sound decision-making in her handling of firearms related situations. Accordingly, rather than terminate Plaintiff's employment based on two-year old information, Undersheriff Nicastle felt it was more fair to have Plaintiff remediate again so that the new administration could assess the state of her current abilities.  *Id.*

Plaintiff asserts that Sheriff Brown admitted that Defendant's position in this lawsuit that Plaintiff has "never" passed any of the remedial training she has been required to undergo multiple times from 2015 to 2019 is factually incorrect.  Brown Dep. [#49-12] at 68:1-73:13.  In his deposition, Sheriff Brown was asked to review the TrakStar entry [#49-3] discussed earlier, which says that Plaintiff "successfully completed" remedial training on February 13, 2015 and an email that said Plaintiff "has not and has never demonstrated

proficiency in this remedial training."  Brown Dep. [#49-12] at 68:1-73:13.   Sheriff Brown testified that the email was inaccurate in light of the TrakStar entry.  *Id.* at 70:8-73:13.

In reply to the previous paragraph, Defendant denies Plaintiff's assertion that Sheriff Brown admitted that Defendant's position is false, and the Court finds that Defendant is correct that Sheriff Brown did not actually so testify.  Defendant also asserts that the statements by Sheriff Brown regarding another author's intent or meaning regarding a statement in a TrakStar entry lacks foundation as he was not the Sheriff at the time and does not know what the author meant.  Further, at the time of his deposition Sheriff Brown was not aware that the author of the TrakStar entry had provided an explanation that Plaintiff had only "successfully passed" the POST-certification firearms test administered to her.  Wickstrom Decl. [#45-2] ¶¶ 5-6.  Wickstrom stated that  test "only measures a shooter's ability to hit a certain number of targets from various distances, and within a certain period of time.  It is not a test concerning firearms safety or any other aspect of firearms handling other than time and distance-based accuracy."  *Id.*  Wickstrom further stated that "[i]t would be up to the Training Department and/or the Support Services Bureau to determine whether Ms. Rodriguez's performance in the remedial training was sufficient to constitute a successful remediation of her safety-related issues."  *Id.*  Finally, given the fact that Sheriff Brown has since learned of Wickstrom's clarification, Brown now concurs that the TrakStar entry [#49-3] and the email cannot both be true; however, he believes that the TrakStar entry is the untrue document.  *See* Brown Decl. [#50-3] ¶¶ 7-8.

To support her argument as to discriminatory animus in the workplace, Plaintiff cites deposition testimony of Leroy Trujillo, a former coworker and detentions deputy, and Terry Reibeling, who was Plaintiff's colleague.  *See Response* [#49] at 8-11.  Plaintiff also cites

the testimony of firearms instructors Victor Thiret and Muthalar Dickson. *Id.* at 12. Additionally, Plaintiff asserts that individuals similarly situated to her committed safety and "decision making" errors, yet were treated less harshly than Plaintiff. *See Response* [#49] ¶ 43 at 13 (citing [#49-14] - Disciplinary Records for Comparators). This evidence is discussed in more detail in Section III.B, *infra*.

## II. Standard of Review

The purpose of a motion for summary judgment pursuant to Fed. R. Civ. P. 56 is to assess whether trial is necessary. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Pursuant to Rule 56(a), summary judgment should be entered if the pleadings, the discovery, affidavits, and disclosures on file show "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." An issue is genuine if the evidence is such that a reasonable jury could resolve the issue in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if it might affect the outcome of the case. *Id.*

The burden is on the movant to show the absence of a genuine issue of material fact. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670-71 (10th Cir. 1998). When the movant does not bear the ultimate burden of persuasion at trial, the "movant may make its prima facie demonstration [of the absence of a genuine issue of material fact] simply by pointing out to the court a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Id.* at 671. If the movant carries the burden of making a prima facie showing of a lack of evidence, the burden shifts to the nonmovant to put forth sufficient evidence for each essential element of his claim such that a reasonable jury could find in her favor. *See Anderson*, 477 U.S. at 248. The nonmovant must go beyond the

allegations of her pleadings and provide admissible evidence, which the Court views in the light most favorable to her. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

### III.  Analysis

**A.  Whether Certain of Plaintiff's Claims are Time-Barred**

Defendant first argues that Plaintiff's claims based on conduct prior to March 9, 2016, are time-barred. *Motion* [#41] at 5-6.[3]  In Colorado, Title VII complainants must file a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") within 300 days after the alleged unlawful discriminatory practice occurred." *Bullington v. United Air Lines, Inc.,* 186 F.2d 1301, 1310 (10th Cir. 1999).  A plaintiff may not rely on the continuing violations doctrine to overcome this requirement. *Id.*  Furthermore, "'each discrete incident of [discriminatory or retaliatory] treatment constitutes its own unlawful employment practice for which administrative remedies must be exhausted.'" *Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, (10th Cir. 2020) (citation omitted); *see also Nat. R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 111 (2002) ("We have repeatedly interpreted the term 'practice' to apply to a discrete act or single 'occurrence,' even when it has a connection to other acts.")  Thus, discrete discriminatory acts are not actionable if time-barred. *Morgan*, 536 U.S. at 111.  "Each discrete discriminatory act starts a new clock for filing charges alleging that act." *Id.*  The EEOC charge, therefore, must be filed within the 300-day time period after the discrete discriminatory act occurred. *Id.*

In this case, Plaintiff filed her charge with the EEOC on January 3, 2017.  *See* Charge [#44-13].  Thus, events occurring on and after March 9, 2016 are covered by the

---

[3] Defendant mistakenly initially states that claims based on pre-March 2019 conduct are barred, although he later clarifies this date to be March 9, 2016. *Id.* at 5.

charge.  Any claims based on "discrete discriminatory or retaliatory conduct" occurring before that date are barred.  *Morgan,* 536 U.S. at 122.

Plaintiff does not dispute that several events involved in her claims occurred prior to March 9, 2016.  These events include:  (1) the initial remedial training she was required to complete as a result of her in-service training with Cunningham in February 2015; (2) the additional training in May, November and December 2015, and January 2016; (2) the referral to IA; (3) the fact that Plaintiff was "decommissioned" twice in 2015; (4) her placement on a PIP in September 2015; and (5) the denial of permission to attend the POST Certification Academy in January 2016, allegedly depriving Plaintiff of the ability to be promoted.  *See Motion* [#41] at 5-6 (citing *Compl.* [#37] at 10-11).

Courts have held that disciplinary actions such as being placed on a PIP, having probation extended, and other disciplinary actions are "discrete" for purposes of exhaustion. *See Dunn v. Shinseki,* No. 14-cv-00367-RBJ, 2015 WL 2455463 at *3 (D. Colo. May 22, 2015).  Moreover, the Court finds that the incidents Plaintiff identifies are "discrete" because, like the examples given in *Morgan,* they occurred on a readily identifiable date and are easy to identify as discriminatory, thus placing Plaintiff on notice that her civil rights were at issue.  *Id.*, 536 U.S. at 105.

Plaintiff's only argument in response to Defendant's assertion that her pre-March 2016 conduct is time-barred as to her discrimination/retaliation claims is that in opposing her earlier filed Motion to Amend Complaint [#30], Defendant averred that the amendment would be futile and subject to dismissal because the additional training that Plaintiff was required to take was not an adverse action.  *See Response* [#49] at 15; *Response Mot. Amend* [#31] at 4.  That is contrary to the argument now raised by Defendant that the

actions were discrete actions that should have been raised within 300 days, and Plaintiff asserts that "Defendants cannot have it both ways."  *Response* [#49] at 15.  However, as Defendant correctly notes, the Court ruled that the required training *could* be considered an adverse action.  *See Order* [#36] at 6-8.  Thus, this argument is without merit.

Based on the foregoing, Plaintiff was required to file her charge of discrimination within 300 days of each discrete adverse action that she alleges.  Accordingly, Plaintiff cannot recover on her discrimination or retaliation claims for any of the actions that occurred prior to March 9, 2016.  The Motion [#41] is thus **granted** as to this issue.

Plaintiff also argues, however, that Defendant's argument does not apply to harassment/hostile work environment claims, and that she has asserted such a claim. Plaintiff is correct.  The Supreme Court has made clear that "[h]ostile environment claims are different in kind from discrete acts.  Their very nature involves repeated conduct." *Morgan*, 536 U.S. at 115.  "The unlawful employment practice . . .cannot be said to occur on any particular day."  *Id.*  Accordingly, "[i]t does not matter . . . that some of the component acts of the hostile work environment fall outside the statutory time period."  *Id.* at 117.  So long as an act contributing to the claim occurs within the filing period, "the entire time period of the hostile environment may be considered by a court for the purposes of determining liability."  *Id.*  The Motion [#41] is thus **denied** as to any argument that events prior to March 9, 2016 are time-barred as to the hostile work environment claim.

**B.    Whether There is Evidence of a Discriminatory Motive Sufficient to Support the Discrimination and Harassment Claims**

In Counts I and III Plaintiff avers she was subjected to discriminatory and harassing conduct because of her race, national origin and sex.  *Compl.* [#37] ¶ 47-57, 67-77, pp. 13-

18.  Under Title VII, it is unlawful for an employer to discriminate against an individual on these bases. 42 U.S.C. § 2000e–2(a)(1); *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993).  The Colorado Anti-Discrimination Act, C.R.S. § 24-34-402(1)(1), "parallels that of its federal counterpart in Title VII, and the Colorado courts look to federal cases for guidance in applying the state statute." *Harris v. Environmental Materials, LLC*, 2018 WL 10604755, at * (D. Colo. Sept. 21, 2018) (citing *Colo. Civil Rights Comm'n v. Big O Tires, Inc.*, 940 P.2d 397, 399-400 (Colo. 1997) (adopting the Supreme Court's analysis in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) in discrimination claims)).

As Plaintiff points to no direct evidence of discrimination, the *McDonnell-Douglas* burden-shifting test applies to all of Plaintiff's Title VII claims, including discrimination, hostile work environment, and retaliation (discussed in the next section).  *See Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985); *Duran v. LaForge N. Am., Inc.*, 855 F. Supp. 2d 1243, 1247-48 (D. Colo. 2012).  Under this burden-shifting test, Plaintiff must first make out a prima case.  *Id.*

To make out a prima facie case of discrimination under Title VII (and CADA), the Plaintiff must show: (1) membership in a protected class; (2) an adverse employment action; and (3) disparate treatment among similarly situated employees.  *Payan v. United Parcel Service*, 905 F.3d 1162, 1168 (10th Cir. 2018).  A plaintiff claiming harassment through a hostile work environment must show: (1) she is a member of a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment was based on her protected class; and (4) the harassment altered a term, condition, or privilege of the plaintiff's employment and created an abusive working environment.  *Id.*

If Plaintiff makes out a prima facie case, "the burden shifts to Defendant to come forward with a legitimate, non-discriminatory basis for its employment decision." *Duran*, 855 F. Supp. 2d at 1248. "If Defendant does so, the inference of discrimination [created by the prima facie case] drops out and the burden shifts back to Plaintiff" to offer evidence that race or other protective status "was a determinative factor in the employment decision or that Defendant's non-discriminatory reason was merely pretext." *Id.* "'A plaintiff demonstrates pretext by showing either that a discriminatory reason more likely motivated the employer or that the employer's proffered explanation is unworthy of credence.'" *Jencks v. Modern Woodmen of America*, 479 F.3d 1261, 1267 (10th Cir. 2007) (citation omitted). "Pretext can be shown by such weaknesses, implausibilities, inconsistencies, incoherence, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted nondiscriminatory reasons." *Id.* Ultimately, "[t]he critical prima facie inquiry in all cases is whether the plaintiff has demonstrated that the . . . employment action occurred 'under circumstances which give rise to an inference of unlawful discrimination.'" *Plotke v. White*, 220 F.3d 405 F.3d 1092, 1100 (10th Cir. 2005) (citations omitted).

Here, Defendant argues that Plaintiff cannot present any evidence on which a fact finder could rely to conclude that discriminatory intent motivated the conduct about which she complains or that her race, national origin, or sex played any role in the challenged decisions. *See Motion* [#41] at 7, 8. Thus, the Motion [#41] avers that Plaintiff cannot meet her ultimate burden of showing that the actions complained of occurred under circumstances which give rise to an inference of unlawful discrimination. *Id.* Additionally,

Defendant asserts that Plaintiff is unable to establish the third element of her harassment claim (that the harassment was based on her protected statuses), the causal connection necessary to establish the third element of her prima facie discrimination case, or to rebut Defendant's legitimate reasons for the complained of conduct. *Id.* at 8. As to the latter issue, the Court finds that Defendant has articulated legitimate, nondiscriminatory reasons for the adverse actions. Defendant has offered evidence from Sheriff Walcher and others that the officers training Plaintiff consistently found that she demonstrated poor safety and decision-making skills despite her ongoing training, and that Plaintiff could thus not perform the duties of the deputy position. See *Motion* [#41] at 19 (citing Walcher Decl. [#44-4] ¶ 21; True Decl. [#41-6] ¶¶ 19-23; Rowlison Decl. [#41-19] ¶ 10).

While it appears that Counts I and III for discrimination/harassment are intended to assert separate claims, both claims rely on the same set of purported facts for purposes of proving discriminatory intent. Plaintiff contends that she can demonstrate the Sheriff's discriminatory intent by showing that the reason given by the Sheriff to justify the sequence of objectionable events (officer safety issues and poor decision-making skills) is unworthy of credence, and thus, may be a pretext for discrimination. Specifically, Plaintiff argues that she was treated less favorably than similarly situated deputies outside her protected classes, and that other circumstances exist which give rise to an inference of discrimination, including remarks that were made by Cunningham and True that Plaintiff asserts demonstrate animosity toward her because she is Hispanic. *See, e.g, Response* [#49] at 17-20. Defendant acknowledges that this kind of evidence may be used to establish the requisite discriminatory intent, but asserts that Plaintiff's reliance on the evidence here is unavailing. *Motion* [#41] at 9. Thus, the Court turns to those issues.

### 1.      Similarly Situated Individuals

Plaintiff asserts that "[i]ndividuals similarly situated to her committed various safety and 'decision making' errors, yet were treated less harshly than Plaintiff." *Response* [#49] at 13; Disciplinary Records for Comparators [#49-14].  A plaintiff may show pretext, and thus, create a plausible inference of discrimination, by demonstrating that she "was treated differently from other similarly situated, nonprotected employees who violated work rules of comparable seriousness, provided the similarly situated employee shares the same supervisor, is subject to the same performance standards, and otherwise faces comparable relevant employment circumstances" or engages on conduct of "comparable seriousness." *E.E.O.C. v. BCI Coca-Cola Bottling Co. of Los Angeles,* 450 F.3d 476, 489 (10th Cir. 2006) (citation and internal quotations omitted); *E.E.O.C. v. PVNF L.L.C.*, 487 F.3d 790, 801 (10th Cir. 2007).

Here, Plaintiff names five deputies whom she asserts committed similar or more egregious safety violations, but were not subjected to the ongoing training requirements and processes that she experienced.  *See Response* [#49] at 13-14 (citing Disciplinary Records [#49-14]).  These five comparators are Deputy Brieske (white male), Deputy Carter (black male), Deputy Hansen (white male), Deputy Hunt (white female), and Deputy Vigil (Hispanic male).  *Id.* at 13, 18-19 (citing Disciplinary Records [#49-14]); *see also Motion* [#41] at 12.[4]  Plaintiff asserts that these five comparators indisputedly worked for

---

[4]  At the outset, Defendant notes that among the five purported comparators one, like Plaintiff, is female, and one, like Plaintiff, is Hispanic, and argues that this "undermines Plaintiff's argument that race or gender played a role in the challenged employment actions. *Motion* [#41] at 12.  Plaintiff asserts that this position is illogical.  Plaintiff is a female, Hispanic, Venezuelan. None of the comparators share these protected bases, or even two out of three of these bases. *See Response* [#49] at 18 n. 1.  The Court accepts Plaintiff's argument for purposes of the Motion

the same supervisor and were subject to the same standards governing performance evaluation and discipline. *Response* [#49] at 18. Defendant does not dispute this. Further, Plaintiff states that while Defendant argues that these deputies are not similarly situated "because the conduct is not comparable" (*Motion* [#41] at 12), the issue is whether the conduct was of "comparable seriousness" to that of Plaintiff's conduct, which she asserts was holstering from the prone position. *Response* [#49] at 18 (citing *PVNF*, 487 F.3d at 801). Thus, the Court turns to that issue.

Deputy Brieske accidentally shot his firearm while holstering and suffered minor injuries; subsequently, Deputy Brieske received a "formal letter of reprimand" and nothing further. *Response* [#49] at 18; Disciplinary Records [#49-14] at 1-2. Deputy Carter stored his duty weapon in the jail in an unsecured cubicle accessible to inmates; subsequently, Deputy Carter received a "letter of reprimand," a "TrakStar entry documenting the incident" and nothing further. *Response* [#49] at 18; Disciplinary Records [#49-14] at 4-6. Deputy Carter subsequently left his "general access keys" unattended in the jail in an area accessible to certain inmates. *Response* [#49] at 18-19; Disciplinary Records [#49-14] at 7. For this second incident, Deputy Carter received another "letter of reprimand" and a "TrakStar entry documenting the incident" and nothing further. *Response* [#49] at 19; Disciplinary Records [#49-14] at 9. Deputy Hansen, through an insufficient pat down of an inmate, allowed a knife to be smuggled into the jail; subsequently, Deputy Hansen received "one day of leave without pay," a "letter of reprimand," and a TrakStar entry. *Response* [#49] at 19; Disciplinary Records [#49-14] at 11. Deputy Hunt suffered an accidental

―――――――――――――――――

[#41].

discharge during a drill where she was clearing a malfunction from her weapon and was only subject to "on-the-spot" remediation. *Response* [#49] at 19 (citing *Motion* [#41] at 13). Deputy Vigil did not bring his duty weapon while on a medical transport and allegedly suffered no adverse consequences.   *Id.* at 19 (citing *Complaint* [#37] at 9).

Plaintiff argues that the comparators' violations were of "comparable seriousness" to Plaintiff's instance of holstering while prone.  In support of this, Plaintiff points to the Disciplinary Records [#49-14] (showing that all documented violations were in contravention of ADM 310A.1, A.2, A.4, A.6, or A.8) and the Notice of Complaint [#43-1] (showing that Plaintiff was charged with violating ADM 310.A.4 and A.6).  According to Plaintiff, all violations of ADM 310, Section A are designated as "Code of Conduct" violations and carry similar penalties and consequences.  *Response* [#49] at 19 (citing Standards of Conduct, Policy Number ADM 310 [#49-15]).  Thus, she argues that the "comparable seriousness" of the comparators' violations is demonstrated by Defendant's own classification of the same.  Defendant does not dispute this.

The Court finds, construing the evidence in the light most favorable to Plaintiff, that she has shown that the five comparators were engaged in conduct of comparable seriousness to her violation of holstering while lying prone on February 10, 2015.  The Court further finds that Plaintiff has met the other requirements for these comparators to be found similarly situated in connection with this incident.  However, the comparator evidence takes into account only Plaintiff's conduct of holstering while lying prone that led to the first remedial training.  It does not take into account the additional concerns demonstrated over time about Plaintiff's poor decision-making skills while handling a firearm and officer safety concerns that led to the additional adverse actions.

Thus, the Court notes that the initial referral to remediation in connection with the February 10, 2015 incident was not limited to the holstering while lying prone incident. The referral listed several instances of "poor decision-making" and "safety issues" in connection with Plaintiff's firearm skills. Chase Mem. [#50-5] at 1. Moreover, the documentation from Plaintiff's first remediation on February 13, 2015 indicated that while Plaintiff passed the POST certified hand gun qualification, Plaintiff's trainers continued to have serious concerns over her poor skills and questionable decision-making, warranting additional remedial training to address those continued deficiencies. True Mem. [#41-10]; Van Hook Decl. [#41-12]; Van Hook Mem. [#41-13]. Investigator True stated, based on her "training and experience as a lead firearms instructor and a Sheriff's Deputy[,]" that while she believed that Plaintiff "can be trained in shooting a gun and she qualified on her firearm, her decision making skills to use lethal force is dangerous not only to herself, but other officers and bystanders." True Mem. [#41-10] at 5.

As Defendant notes, the documentation from each successive remediation demonstrates that Plaintiff continued to struggle with basic firearms fundamentals, and continued to demonstrate safety violations (e.g., muzzling her own leg, negligent discharge, and issues with appropriate decision-making skills) even more than a year and a half after she was first referred to remediation. *See* True Mem. [#41-11]; Van Hook Mem. [#41-14]; Hallett Mem. [#41-16]; Gabriel Mem. [#41-18]; Line Mem. [#43-7]; Takayama Decl. [#44-1]; Takayama Mem. [#44-3]; Bohm Mem. [#44-9]; Dyffryn Decl. [#44-10] ¶¶ 3-7; Hoffman Decl. [#44-12] ¶¶ 4-6. For example, when additional remedial training was ordered through the PIP plan, Plaintiff's performance was again found to be deficient, leading to the recommendation that she be removed from her deputy position and placed on

administrative leave.  *See* Line Mem. [#43-8] ("the additional training has not alleviated concerns about her ability to safely carry and deploy a firearm" and to perform other essential functions of the job).  Plaintiff's additional firearms training at the 2016 Academy also resulted in a finding of safety violations and poor firearms handling skills, which led to Chief Line's recommendation that Plaintiff be removed from her position and allowed to assess for a non-law enforcement position.  *Id.*

The evidence as to the five comparators does not show conduct of comparable seriousness to these continuing violations by Plaintiff, even construing the evidence in the light most favorably to her.   The comparators all engaged in single instance conduct that was either remediated on the first attempt (Brieske, Hunt, Hanson), or rendered moot after appropriate discipline was imposed (Carter).    *See* Etheridge Dec. [#41-8] ¶ 36(a)-(g).[5] Plaintiff received the same treatment as the comparators initially (an opportunity to remediate), but had continuing issues with safety and firearm competency that were found to affect her ability to perform the essential functions of her job, issues that the other comparators did not have.  *See* Disposition Mem. [#43-5] at 8-9 ("Deputy Rodriguez has significant issues with her performance. . . .[I]t is obvious that she cannot perform the duties of the Deputy position").

---

[5]  Brieske completed his remedial training and there have been no other safety violations of that nature in the interceding nine years.  *Id.*  ¶ 26(a); Disposition Mem. [#45-10].  After Hunt engaged in on-the-spot remediation, she did not experience any further safety violations warranting any additional remedial training, an IA investigation, or any other measures.  Etheridge Decl. [#41-8] ¶ 26(b).  Similarly, after Hansen's violation, which did not involve a firearm, he did not have any recurrences and no additional concerns were noted.  *Id.* ¶ 26(f).  Vigil's conduct was also alleged by Plaintiff to be a single instance.  *See Compl.* [#37] ¶ 25(g).  Finally, as to  Carter (the only comparator alleged to have repeated an alleged safety violation), Defendant asserts that his violations were resolved when he took responsibility for his conduct and resigned his position with the Alternative Sentencing Program ("ASP").  Disposition Mems. [#44-12, #44-14].

Based on the foregoing, the Court finds that Plaintiff has not shown that the five comparators are similarly situated to her.  Plaintiff's reliance on these comparators thus does not support a finding of pretext.

The Court also finds that to the extent Plaintiff relies on her subjective conclusion that she was treated less favorably than others because she is female, Hispanic and Venezuelan (*see* Pl.'s Dep. [#49-1] at 32:4-7, 34:20-35:9), this is not sufficient to establish proof of discriminatory intent.  *Ash v. Aurora Pub. Schs.* No. 18-cv-01280-CMA-MEH, 2020 WL 42274, at *10 (D. Colo. July 23, 2020) (finding that "subjective, belief-oriented conclusions" made in evidence were insufficient to demonstrate pretext).  The *Ash* court further held that "[c]onclusory statements based merely on conjecture, speculation, or subjective belief do not constitute competent summary judgment evidence, and '[u]nsubstantiated allegations carry no probative weight.'"  *Id.* (quoting *Bones v. Honeywell Int'l*, 366 F.3d 869, 875 (10th Cir. 2004)).

### 2.   The Other Circumstantial Evidence Relied on by Plaintiff

A plaintiff is not, however, required to point to similarly situated employees, "if she can otherwise point to circumstances which give rise to an inference of discrimination."  *See Freeman v. Spencer Gifts, Inc.*, 333 F. Supp. 2d 1114, 1129 (D. Kan. 2004).  The Court must "consider the totality of the circumstances when considering whether pretext exists."  *Ash*, 2020 WL 4227475, at *6 (citing *Fassbender v. Correct Care Sols.*, LLC, 890 F.3d 875, 885 (10th Cir. 2018)).  "If the evidence as a whole reveals a 'nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue,'" summary judgment is appropriate.  *Id.*

Defendant references two remarks that were made by Cunningham and True that Plaintiff asserts demonstrate animosity toward her because she is Hispanic, discussed further below.  Defendant asserts that Plaintiff has admitted on several occasions that she is not aware of any other comments of an arguably racial or ethnic nature by True, Cunningham, or anyone else.  Pl.'s Dep. [#49-1] at 210:6-211:6, 225:10-226:23; *see also* Thompson Mem. [#44-16] at 14-17.

Plaintiff responds that her "evidence of bias is ample and plentiful, the ultimate consequence of being a quintessential function of the jury." *Response* [#49] at 17.  Plaintiff avers that while Defendant cites to only the two comments she relies on which are "certainly good evidence of discriminatory bias[,]" she "has proffered much more."  *Id.* Thus, Plaintiff notes that Defendant's own TrakStar record [#49-3] shows Plaintiff passed the very first remedial training she was ordered to attend on February 13, 2015; that Plaintiff's coworkers, one with 31 years of experience working for Defendant, have never seen a deputy disciplined repeatedly over a period of years for a minor incident that occurred in training; that Defendant has entered into at least one discrimination related settlement with DOJ during the time Plaintiff has been employed; and that Deputy True's assertion that Plaintiff has safety issues is not credible.  *Id.*  The Court turns to whether Plaintiff's evidence is sufficient to demonstrate that race or other protected status was a determinative factor in the employment decisions or that Defendant's non-discriminatory reason was merely pretext.  *Duran*, 855 F. Supp. 2d at 1248.

### a.    The Comments Relied on by Plaintiff

Plaintiff first asserts that on a few occasions when True worked in booking, she expressed joy over the deportation of undocumented aliens of Hispanic heritage by saying,

"Woohoo! We got another one."  Thompson Mem. [#44-16] at 16.  Defendant asserts that no reasonable jury could conclude that this purported statement demonstrates bias against Plaintiff because she is Hispanic.  *Motion* [#41] at 9-10.  The Court agrees, finding that this evidence falls "short of pretext."   *Watts v. City of Norman,* 270 F.3d 1288, 1297 (10th Cir. 2001).

The Court first finds that Plaintiff's interpretation of that comment is subjective and relies on improper speculation regarding True's motives for making the statement.  There is nothing overtly discriminatory about the comment, as it does not reference the inmate's purported race or ethnicity.  The lack of context makes the comment, at best, ambiguous. While Plaintiff may *believe* that True's comment was intended to express bias against Hispanics, she has not pointed to any evidence in the record that supports the contention that this statement was made with discriminatory animus.  *See Ash*, 2020 WL 4227245, at *7.  Plaintiff's belief is mere conjecture and is not competent summary judgment evidence. *Id*.  Moreover, Plaintiff has not shown that this comment was directed at her, or that it had any bearing on her ability to perform her job.  *Watts*, 270 F.3d at 1297.  Plaintiff has also not shown a nexus between this comment and the later actions at issue, as required to show discriminatory animus.  *Rea v. Martin Marietta Corp.*, 39 F.3d 1450, 1457 (10th Cir. 1994).  Finally, the comment  was made in 2008, some seven (7) years before the events of this lawsuit.  Thompson Mem. [#44-16] at 47.  Even if a jury were to ascribe the meaning Plaintiff suggests, the length of time between the expression of the comment and the events giving rise to this lawsuit is so remote as to render the comment meaningless for the purposes of addressing the specific conduct complained of here.  *See Watts*, 270 F.3d at 1297 (holding stray remarks remote in time are not probative of pretext).

The next comment that Plaintiff relies on is attributed to Cunningham. Plaintiff asserts that during a training exercise, Cunningham ran a "shoot/no shoot" drill using targets shaped like hands, painted brown on one side and white on the other. According to Plaintiff, Cunningham told the group of students that "the brown hands are the bad guys and the white hands are the good guys." Pl.'s Dep. [#41-1] 109:10-111:25; Thompson Mem. [#44-16] at 14. Plaintiff avers that when another student pointed out possible racial implications of the target colors, Cunningham "feigned ignorance." *Id.*

Cunningham's "bad guys" comment is, admittedly, more probative of pretext and discriminatory animus, even though it does not explicitly reference racial or ethnic groups. A reasonable fact finder could find that the "brown hands" belong to a person of color or a non-white ethnicity, and that the "white hands" refer to a white person. Nonetheless, the Court again finds that this is another isolated remark that is not sufficient to demonstrate pretext. First, the comment was again remote in time, occurring at least three years before the events at issue (Thompson Mem. [#44-16]). *Watts*, 270 F.3d at 1297. Second, as with True's comment, Plaintiff has not offered evidence that this comment was directed at her, had any bearing on her ability to perform her job, or that there is a nexus between this comment and Cunningham's later actions in February 2015 that led to Plaintiff being required to remediate. *See Rea*, 39 F.3d at 1457 (noting that a causal nexus can be shown if the allegedly discriminatory comments were directed at the plaintiff, her position, or the defendant's policy which resulted in the adverse action taken against the plaintiff).

### b.   The TrakStar Entry

The Court now turns to the TrakStar entry [#49-3] that states Plaintiff "successfully completed" her remedial training on February 13, 2015. Plaintiff argues that this entry

shows that the legitimacy of Defendant's concerns that Plaintiff exhibited poor decision-making and safety skills in use of force situations is questionable, and that further remediation was unnecessary.   *See* Pl.'s Dep. [#41-1] at 155:8-23.   Plaintiff's reliance on this entry as evidence of pretext in connection with the adverse actions is problematic. Defendant shows that the TrakStar entry was made by Plaintiff's lieutenant at the time, Lori Wickstrom.  Wickstrom Decl. [#45-2] ¶ 5.  Wickstrom was not a firearms instructor, was not present at the training, and was not in charge of deciding whether Plaintiff had successfully completed the training.  *Id.* ¶¶ 5-6.  Further, Wickstrom testified that what she meant by "successfully completed" was merely that Plaintiff had qualified with her weapon.  *Id.* ¶ 6.

Defendant asserts, and the Court agrees, that Plaintiff has pointed to no evidence that contradicts Wickstrom's explanation.  This means that Wickstrom's explanation that Plaintiff "successfully completed" the training does not suggest that Plaintiff had no remaining issues to remediate after February 13, 2015.  Instead, the comment reasonably suggests that Plaintiff successfully qualified, an accomplishment that Defendant asserts has never been an issue in this lawsuit.  *See Motion* [#41] at 19.  This is consistent with the statements by True, an instructor at the training, who indicated that while Plaintiff "qualified" on her firearm, her decision making skills were still deficient and made her dangerous. True Mem. [#41-10] at 3, 5; see also Van Hook Decl. [#41-12].

In addition, Defendant asserts that even if the Court were to conclude that Wickstrom's statement suggests Plaintiff had resolved the holstering-while-prone concern, it does not address the decision-making and safety concerns observed by True and Van Hook *during* the simulation training Plaintiff requested at the end of the remedial training. *See* Pl.'s Dep. [#41-1] 258:17-261:3.  It is in this segment that Plaintiff displayed additional

questionable firearms-related decisions that caused the trainers to doubt her ability to make important safety related decisions. *Id.* at 258:17-261:3; True Mem. [#41-10] at 3-5; Van Hook Mem. [#41-13] at 2-4.

Thus, while the Sheriff maintains Plaintiff did not "successfully complete" her initial remedial training, even if the Court were to conclude otherwise, that conclusion does not suggest the Sheriff's additional safety concerns identified in that training and justifying the entire course of training at issue in this lawsuit were pretextual. Furthermore, given Plaintiff's subsequent poor performances in May 2015 and in her second and third chances thereafter, a reasonable fact finder could find the Sheriff's concerns were justified. *See* True Mem. [#41-11] at 2-3; Van Hook Mem. [#41-14] at 1-4; Hallett Mem. [#41-16] at 5-6; Gabriel Mem. [#41-18] at 4; Bohm Mem. [#44-9] at 1-2; Dyffryn Decl. [#44-10] ¶¶ 3-7; Hoffman Decl. [44-12] ¶¶ 4-6.

Plaintiff's only response to Defendant's detailed analysis of the Trakstar entry is that it is "good evidence" of pretext. *Response* [#49] at 20. However, the Court has found nothing in the record that overcomes Defendant's explanation as to the TrakStar entry and why it is not probative of pretext as to the Sheriff's ongoing concerns about Plaintiff's performance. Even though all doubts must be resolved in Plaintiff's favor, when the facts are reconsidered in their entirety, as they must be, the TrakStar entry does not raise a genuine issue of material fact on the issue of pretext.

### c.    Plaintiff's Reliance on Testimony of her Coworkers

Plaintiff also asserts that her coworkers, one with 31 years of experience working for Defendant, testified that they have never seen a deputy disciplined repeatedly over a period of years for a minor incident that occurred in training. *Response* [#49] at 17.

Plaintiff cites testimony from Leroy Trujillo ("Trujillo"), who testified that he had "never heard anything like it." Trujillo Dep. [#49-8] at 98:1-7. She also cites testimony from Terry Reibeling ("Reibeling"), who testified that he had "never known anybody in my 31 years there that . . . qualified, had to remediate, qualified, again, and then had to remediate again. . . ."). Reibeling Dep. [#49-2] 45:4-24. This testimony, and the fact that Plaintiff "qualified" on her firearm on February 13, 2015, do not, however, address the ongoing and repeated safety violations by Plaintiff throughout her training and the concerns about her decision-making skills as previously discussed. *See, e.g.*, True Mem. [#41-10].

Furthermore, while Plaintiff cites additional testimony of Trujillo and Reibeling, much of this amounts to the subjective beliefs of the witnesses. *See, e.g.,* Trujillo Dep. [#49-8] at 27:11-15, 32:21-33:3, 52:10-23, 72:10-73:8 (testifying that he felt he was being singled out or treated poorly by supervisors whose actions are not in question here; that he was discriminated against by Chief Line and Jon Takayama, and that it was "lucky" if you had three or four minorities on your shift); Reibeling Dep. [#49-2] at 31-9-33:7, 36:5-13, 56:3-17, and 59:17-61:16 (testifying that Cunningham "went ballistic" at the February 2010 training and singled out Plaintiff, "dress[ing] her down," which he didn't think was correct; that he thought Plaintiff was very professional at work; that in his opinion Cunningham harbored a grudge against him, and that Cunningham used that grudge and "every power that he could to make [Plaintiff's] life miserable" at the training event" on February 10, 2015; and that he believed Cunningham's "bad guys" comment was racially motivated. Again, this is not competent evidence. *Ash*, 2020 WL 4227245, at *7.

None of the testimony from Trujillo, Reibeling or other persons supports Plaintiff's assertion that Cunningham, True or any other decision maker at the ACSO had a

-29-

discriminatory animus towards Plaintiff, or that the reasons given by Defendant for the adverse employment actions against Plaintiff were not worthy of credence.  For example, Plaintiff cites Reibeling's testimony as a firearms instructor that he would have handled the incident with Plaintiff holstering the gun while prone differently from the way it was handled by Cunningham, as it was a "minor" safety issue (Reibeling Dep. [#49-2] at 24:8-20); Victor Thiret's testimony that as a firearms instructor he was not aware of safety problems with Plaintiff (Thiret Dep. [#49-10] at 20:12-24); and firearms instructor Muthalar Dickson's testimony that he had not witnessed safety concerns pertaining to Plaintiff that could not be addressed immediately in training (Dickson Dep. [#49-11] at 11:16-22).  This testimony about what those instructors would have done differently or what they thought about safety issues concerning their observations of Plaintiff is anecdotal and in no way sheds light on or calls into question the actions of Cunningham, True, Van Hook and other decision makers that found safety concerns and poor decision making skills which were demonstrated repeatedly in training before them, as discussed previously.

Finally, to the extent that Plaintiff cites the testimony of Trujillo and Reibeling to show a general "widespread" discriminatory atmosphere at the ACSO, the testimony does not relate to discrimination or harassment from Cunningham and True, the alleged instigators of the discrimination against Plaintiff and the persons who Plaintiff repeatedly complained about. *See Compl.* [#37] ¶¶ 17-18 (Cunningham and True "infected all further interactions between the County and Ms. Rodriguez with unlawful discriminatory animus based on sex, race, and national origin[,]" and they, "supported by the rest of the training division, began to relentlessly target" Plaintiff, "seeking to end her long and successful tenure with the County"); *Response* [#49] at 20 (referring to a cat's paw theory where the decisionmaker

is being used by other persons harboring discriminatory animus).  The Tenth Circuit has made clear that "[a]necdotal evidence" is only admissible if "'the prior instances of alleged discrimination can somehow be tied to the employment actions disputed in the case at hand[,]'" such as if "the same supervisors were involved in prior discriminatory actions." *Heno v. Sprint/United Mgmt. Co.*, 208 F.3d 847, 856 (10th Cir. 2000) (citation omitted). Accordingly, this testimony also cannot be used to support a finding of pretext.

### d.   Plaintiff's Evidence of a Settlement and that True is Not Credible

The Court next addresses Plaintiff's evidence that Defendant has entered into at least one discrimination related settlement with Department of Justice ("DOJ") during the time Plaintiff has been employed (*see* [#49-7]), and that Deputy True's assertion that Plaintiff has safety issues is not credible.  The Court first addresses the settlement.

Plaintiff asserts that in 2013, while Plaintiff worked as a detentions deputy for Defendant, Defendant entered into a settlement agreement with the DOJ based on its investigation that "established that the Office of the Sheriff improperly restricted law enforcement positions to U.S. citizens notwithstanding the fact that no law, regulation, executive order, or government contract authorized it to restrict employment in this manner."  DOJ Press Release [#49-7].  Notwithstanding the fact that this exhibit contains inadmissible hearsay statements and references only "allegations" of discrimination, Plaintiff has not shown that the settlement is any way relevant to the issues she experienced and the adverse actions/harassment that she alleges occurred.  It is thus not probative of pretext.  *See Simms v. Okla. ex rel. Dept. of Health and Mental Health and Substance Abuse Servs.*, 165 F.3d 1321, 1330 (10th Cir. 1999) (finding that assertion that prior settlement meant that decisions not to promote the plaintiff were discriminatory was

"not probative of pretext unless the prior incidences of alleged discrimination can somehow be tied to the [disputed] employment actions"), *overruled on other grounds* by *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002).

Plaintiff also relies on Reibeling's testimony questioning True's statement to him that she thought Plaintiff was a poor deputy because she observed safety issues.  Reibeling testified as to that issue that "I know Deputy True, when I've talked to her on occasion, didn't think Deputy Rodriguez was a good deputy.  She told me herself . . . She said she thought she [Plaintiff] was dangerous and I asked how she knew that, and Deputy True told me when she taught Deputy Rodriguez in the academy, she noticed several issues with her training . . .   And I confronted Deputy True at that time, and I said, 'I find that hard to believe, because Deputy Rodriguez went through the academy in 2009, and you didn't become a firearms instructor until 2010."   Reibeling Dep. [#49-2] at 48:7-21.  Plaintiff asserts that this testimony supports a finding that True's finding of safety concerns regarding Plaintiff is not credible.

The Court does not find Reibeling's testimony on this issue probative as to pretext. Regardless of whether True was credible regarding interactions with Plaintiff at the Academy in 2009 or 2010  and her alleged observation of safety violations at that time, it is undisputed that True found the Plaintiff had performance deficiencies and deficiencies in problem-solving in the training that True conducted in February 2015.  These deficiencies were substantiated by co-trainer Van Hook (Van Hook Decl. [#41-12]).  The officers who conducted later training also documented such deficiencies, as previously discussed.  The credibility of True as to statements regarding events that occurred at the Academy simply

is not probative in light of these later credible findings.[6]

### e.     The Conduct of Cunningham and True

Finally, to the extent that Plaintiff's claims rely on the Court inferring that Cunningham and True treated her in a discriminatory manner, the Court notes that the admissible evidence Plaintiff has adduced as to this issue demonstrates otherwise.  While there is certainly evidence that Cunningham yelled and cursed at Plaintiff during the in-service training on February 10, 2015 (Pl.'s Dep. [#41-1] at 135:3, 101:12-102:4), Plaintiff cannot show this was based on discriminatory animus as to her.  Plaintiff testified that Cunningham yells at everyone and treats everyone poorly.  Specifically, when asked about the initial incident with Cunningham on February 10, 2015, which started the sequence of events at issue in this case, Plaintiff testified that Cunningham has a reputation for that conduct, i.e., for being abrasive and attacking and belittling people, and "that's how he runs the department."  Pl.'s Dep. [#41-1] at 95:24-97:14.  Defendant has presented additional evidence that Cunningham frequently raises his voice during instruction involving deputies of all races, genders and ethnicities.  Vaala Decl. [#41-4] ¶ 7; Johnston Decl. [#41-6] ¶11.  While Plaintiff also testifies in her deposition that she believes Cunningham was singling her out because she was an Hispanic woman from Venezuela, and that he would not do that to a white person (Pl.'s Dep. [#41-1] at 97:17- 101-5), she cites no evidence to support that other than her own conjecture, which is inadmissible.  *Bones*, 366 F.3d at 875.  Moreover Plaintiff immediately went on in her deposition to admit that Cunningham yells and screams all day long at everyone.  *Id.* 101:6-16.

---

[6] Given the Court's finding on this issue, the Court need not address Defendant's argument that Reibeling's testimony is unreliable.  *See Reply* [#50] at 5-6 (discussing ¶ 37).

Similarly as to True, Plaintiff testified that True is an "equal opportunity hater." Pl.'s Dep. [#49-1] at 211:23-213:21. Further, Defendant notes that Plaintiff has no basis to compare her accusations against True to the typical way True interacts with deputies of all races. *Reply* [#50] at 9. In fact, there is unrebutted evidence in the record that True routinely approaches her instructional duties with respect to all deputies – regardless of race, gender or ethnicity – with passion, bluntness, and zeal, which are often interpreted as rudeness and brusqueness. True Decl. [#41-9] ¶¶ 5-6; Dyffryn Decl. [#44-10], ¶ 8, p. 4. While Plaintiff testified that she believed that True did not like her because she was Hispanic (Pl.'s Dep. [#49-1] at 212:10-213:1), again this is mere conjecture and is not proper evidence on summary judgment.

Finally, the undisputed evidence also shows, according to Defendant, that neither Cunningham nor True nor any other decision-maker used any racial epithets nor made any racially charged comments during the relevant period, which are the usual hallmarks of a racially hostile work environment. *Reply* [#50] at 9 (Pl.'s Dep. [#49-1] at 98:22-99:8, 208:20-209:22; Vaala Decl. [#41-4] ¶ 7). The *only* comments made by Cunningham and True that could potentially be indicative of racial comments were remote in time and not probative of pretext, as discussed previously.

### f.    Conclusion

Even considering the evidence of pretext in its totality and construing all inferences in the light most favorable to Plaintiff, the Court finds that Plaintiff has not demonstrated that the adverse employment actions occurred under circumstances which give rise to an inference of unlawful discrimination. Plaintiff also has not presented sufficient evidence to rebut Defendant's legitimate reasons for the complained of conduct.

Similarly, as to the hostile work environment claim, even construing Plaintiff's evidence in its totality, the evidence does not demonstrate that Cunningham's, True's, or any other decision-makers' actions constitute a race, gender, or national origin-based hostile work environment.  Without such evidence, Plaintiff cannot show the purported hostile environment was based on a protected trait.  Even if it were severe or pervasive, which the Court seriously doubts,[7] without evidence showing the harassment was based on a protected trait, there is no actionable claim.  *Payan,* 905 F.3d at 1170.

Accordingly, summary judgment is **granted** as to Counts I and III, the discrimination and harassment/hostile work environment claim.

## C.    Retaliation Claims (Counts II and IV)

In Counts II and IV, Plaintiff alleges that she was retaliated against when she complained of discrimination and harassment to Sheriff Walcher on August 26, 2015, September 1, 2015, and March 21, 2016.  *Compl.* [#37] ¶¶ 58-66, 78-83.  Plaintiff avers that she engaged in further protected activity when she reported allegations of discrimination on June 17, 2015, November 25, 2015, January 3, 2017, and January 4, 2017.  *Id.*  Plaintiff further avers that adverse employment actions resulted from the protected activity, including being decommissioned on August 19 2015; being placed on a PIP on September 1, 2015; having the PIP extended and being decommissioned again on November 25, 2015; being required to conduct remedial training per a "Remediation Plan" of March 27, 2019, despite the fact that she had already completed remedial training as far back as February 13, 2015; and being decommissioned (removed from her job) one

---

[7] The Court does not specifically address this issue as it was not argued in the Motion [#41].

day after she filed her charge of discrimination with the EEOC. *Id.* ¶¶ 64-65, 84-85.

Title VII forbids an employer from retaliating against an individual because the individual "has opposed any practice made an unlawful employment practice" by Title VII. 42 U.S.C. § 2000e–3(a). In order to establish a prima facie case of retaliation, a plaintiff must show that she (1) engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action to be materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action. *Somoza v. Univ. of Denver*, 513 F.3d 1206, 1212 (10th Cir. 2008). Ultimately, the plaintiff must provide "proof that the desire to retaliation was the but-for cause of the challenged action." *Univ. of Texas Southwestern Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013).

Defendant argues that the evidence is not sufficient to raise a genuine issue of material fact on Plaintiff's ultimate "but for" burden. *Motion* [#41] at 17. First, it is argued that Plaintiff cannot tie some of the adverse actions to the purported retaliator because she cannot show the actor had knowledge of her protected activity. *Id.* Second, Defendant argues that "other than dubious temporal proximity, which is not sufficient on its own, Plaintiff can point to no other evidence of pretext or "but for" causation." *Id.* The Court turns to those issues.

### 1. Knowledge of the Protected Activity

As a prerequisite to the showing of causation, a plaintiff must present evidence from which a reasonable jury can conclude that the person taking the adverse action had knowledge of her protected activity. *See Montes v. Vail Clinic Inc.,* 497 F.3d 1160, 1176 (10th Cir. 2007). Plaintiff asserts that True stepped up her negative treatment of her at the

November 2015 remedial training and the 2016 Academy in retaliation for Plaintiff's complaints to Sgt. Walker and Sheriff Walcher.    Pl.'s Dep. [#49-1] at 207:19-213:21. Similarly, she claims that Line informed her she would be "decommissioned" only one day after she filed her EEOC charge.  *Compl.* ¶ 65; Pl.'s Dep. [#49-1] at 7:13-18, 176:4-12.

Defendant asserts that Plaintiff can present no evidence that True knew she had complained or that anyone at ACSO was aware Plaintiff had filed an EEOC charge prior to the decision to "decommission" her on January 4, 2017.  *Motion* [#41] at 18.  True testified she was not aware of any complaints made about her by Plaintiff in 2015 or 2016. True Decl. [#41-9] ¶ 18.  Chase, the training sergeant, testified that he did not tell True about any complaints because he also was not aware of any.  Chase Dep. [#45-7] at 119:16-120:5.  Although Plaintiff testified that True knew of the complaints, when asked to identify the evidence supporting her claim, Plaintiff could point to nothing other than her mere belief.  Pl.'s Dep. [#41-1] at 201:20-207:18.  Again, a plaintiff's subjective beliefs are not competent summary judgment evidence.   *Ash*, 2020 WL 4227245, at *7.

Similarly, Defendant asserts that there is no evidence Line knew Plaintiff had filed a charge when he met with her on January 4, 2017.  The EEOC did not serve the Sheriff with Plaintiff's charge until January 5, 2017, the day after Plaintiff's meeting with Line. Def.'s Ex. 24, Notice of Charge.  Plaintiff testified that she told Line about the charge at the January 4 meeting, but only after he communicated to her that he had recommended she be "decommissioned."   Pl.'s Dep. [#49-1] at 176:4-12. Finally, logic dictates that the "decommissioning decision" must have been made *before* January 4 because Line set up the meeting for that date for the express purpose of informing Plaintiff about the decision. *See* Line Decl. [#43-6] ¶¶ 9-10.  Plaintiff has pointed to no evidence that Line made the

"decommission" decision *because* Plaintiff filed her EEOC charge.

Plaintiff does not directly address the above evidence from True and Line in her Response [#49], which remains unrebutted.  Plaintiff argues instead that Defendant's argument ignores the many times Plaintiff complained to various individuals from June 17, 2015 to present.  *Id.* at 20 (citing the Motion [#41] at 17 that acknowledged Plaintiff's second complaint to a supervisor on August 26, 2015 was *to the Sheriff*).   Plaintiff also asserts that Defendant's argument does not address Plaintiff's allegations that retaliation was ongoing since 2015 and occurred as recently as March 27, 2019.  *See Compl.* [#37]. These arguments do not, however, rebut Defendant's evidence that True did not know of Plaintiff's complaints to others when she allegedly stepped up her negative treatment of Plaintiff in November 2015 and the 2016 Academy.  Similarly, Plaintiff has not rebutted the evidence that Line was told about the EEOC charge only after he told Plaintiff that she had recommended she be "decommissioned."

Plaintiff also argues that, "critically, Defendant fails to address that Plaintiff has adduced much evidence in support of her cat's paw theory."  *Response* [#49] at 20; *Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1176 (10th Cir. 2007) (direct knowledge unnecessary where the person allegedly harboring discriminatory animus "knew and used . . .the person who effected the adverse action, 'as a cat's paw to effect ... [the harborer's] own biased designs'") (citation omitted).  Plaintiff does not cite what evidence she has allegedly adduced in support of this theory, and her argument is unsupported.  As Defendant notes, a "cat's paw" theory is dependent on True's and Cunningham's purported retaliatory animus driving the ultimate decisions by the Sheriff to order more training. However, because True and Cunningham had no knowledge of the complaints, they

cannot, as a matter of law have been motivated by retaliatory intent.  *Singh v. Cordle,* 936 F.3d 1022, 1043 (10th Cir. 2019) ("Plaintiff must therefore point to evidence that those who acted against [her] knew of [her] formal complaint").  Without such evidence,  the decisions by those whose relied on True's and the other firearms instructors' assessments cannot be said to have been infected or controlled by the persons with alleged retaliatory intent.

Based on the foregoing, the Court finds that summary judgment must be **granted** as to Plaintiff's claim of retaliation by True in connection with her alleged negative treatment of Plaintiff at the training on November 24, 2015 and during the 2016 Academy.  Summary judgment is also **granted** as to Plaintiff's claim of retaliation by Line in connection with his recommendation to decommission Plaintiff on January 4, 2017.

### 2.    Causation/Pretext

Defendant also argues that summary judgment is appropriate as to the retaliation claim in its entirety because Plaintiff can point to no evidence sufficient to show pretext. *Motion* [#41] at 18.  Defendant notes that Plaintiff relies on two arguments: (1) the temporal proximity between her complaints and the adverse actions that occurred later; and (2) the note in her TrakStar entries stating she "successfully completed" remedial training on February 13, 2015.  *Id.*  As to the TrakStar entry [#49-3], the Court previously discussed this evidence in Section III.B.2.b, *supra*, and found that it was not sufficient to raise a genuine issue of material fact on the issue of pretext.  The Court made similar findings as to the other evidence Plaintiff relied on to show pretext in connection with her discrimination and harassment claims.  *See generally* Section III.B.2, *supra*.

That leaves Plaintiff only with the temporal proximity argument in support of her retaliation claims.  Plaintiff is correct that in some cases, close timing between the adverse action and the protected activity sufficiently establishes the causal link required to make out a prima facie case of retaliation.  *See, e.g., Davis v. BAE Systems,* 764 F. App'x 741, 744 (10th Cir. 2019).  However, the Tenth Circuit has consistently stated that regardless of how close the timing may be, temporal proximity alone is *not* alone sufficient to establish pretext or the ultimate "but for" causation.  *Annett v. Univ. of Kansas*, 371 F.3d 1233, 1240 (10th Cir. 2004); *see also Proctor v. United Parcel Service, Inc.,* 502 F.3d 1200, 1213 (10th Cir. 2007).  The case cited by Plaintiff, *Mestas v. Town of Evansville, Wyoming*, 786 F. App'x 153 (10th Cir. 2019), holding that "[o]n it's own, temporal proximity between protected activity and adverse employment action can establish causation[,]" was referring to the causal connection element of a prima facie case.  *Id.* at 157-58 ("Those seventeen days alone could conceivably establish the causation prong of Mestas's *prima facie case.*") (emphasis added).  It did not address pretext or the ultimate but-for causation issue that temporal proximity evidence alone cannot establish.  *Annett*, 371 F.3d at 1240.

The Court therefore finds that summary judgment must also be **granted** as to the retaliation claims (Counts II and IV).

### IV.  Conclusion

Based upon the foregoing,

IT IS HEREBY **ORDERED** that Defendant's Motion for Summary Judgment [#41] is **GRANTED**.  Judgment shall enter in favor of Defendant and against Plaintiff on all claims.

Dated:  March 8, 2021

BY THE COURT:

Kristen L.  Mix
United States Magistrate Judge